**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **CARPENTER TECHNOLOGY CORP.,** | : | **CIVIL ACTION** |
| **Plaintiff** | : | |
| | : | **NO. 08-2907** |
| **v.** | : | |
| | : | |
| **ALLEGHENY TECHNOLOGIES, INC., et al.,** | : | |
| **Defendants** | : | |

**M E M O R A N D U M**

**STENGEL, J.**                                                                     **July 15, 2009**

This is a patent infringement case.  Carpenter Technology Corporation (Carpenter) and Allegheny Technologies Incorporated (ATI) are competitors in the metallurgy industry. Carpenter brought the current suit to challenge certain patents held by ATI and its subsidiary, ATI Properties,[1] on the production of large-diameter ingots of nickel base superalloys.  The complaint also includes an antitrust claim that ATI is monopolizing, attempting to monopolize, or has conspired to monopolize the market for these nickel base alloy ingots and a Lanham Act[2] claim that ATI engaged in unfair competition by advertising its fraudulent patents to Carpenter's existing and potential customers.  ATI moved to dismiss the latter claims.  (See Mot. to Dismiss

---

[1] This memorandum will refer to the defendants ATI and ATI Properties collectively as "ATI."

[2] The Lanham Act bars the use of a "false or misleading description of fact, or false or misleading representation of fact" in connection with the sale of goods in interstate commerce.  Sandoz Pharm. Corp. v. Richardson-Vicks, Inc., 902 F.2d 222, 227 (3d Cir. 1990) (quoting Trademark Law Revision Act, Pub. L. No. 100-667, § 132, 102 Stat. 3946 (1988)).  In addition to proscribing the use of blatant falsehoods, the Lanham Act has been interpreted to be broad enough to cover "innuendo, indirect imitations, and ambiguous suggestions" causing the target audience to misapprehend the import of the facts of an advertisement.  Id. (quoting Procter & Gamble Co. v. Chesebrough-Pond's, Inc., 747 F.2d 114, 119 (2d Cir. 1984)).

(Document #33).)  For the following reasons, I will grant the motion in part and deny it in part.

## I. Background

Carpenter is "a global manufacturer and distributor of specialty alloys, powder alloys, titanium, and other materials that serve the automotive, aerospace, energy, industrial, medical, defense, and consumer products industries."  (Am. Compl. ¶ 4 (Document #30).)  It makes and sells ingots of nickel base 718 Alloy at its mill in Reading, Pennsylvania.  (Id.)  Before March 8, 2001, it had made substantial preparations to produce a nickel base 718 Alloy ingot with a diameter of at least thirty inches.  (Id. ¶ 7.)

ATI is the holder of United States Patent Numbers 6,416,564 (the '564 Patent) and 6,719,858 (the '858 Patent).  (Id. ¶¶ 8–9.)  The '564 Patent was issued on July 9, 2002, and is entitled "Method for Producing Large Diameter Ingots of Nickel Base Alloys."  (Id. ¶ 8.)  The patent relates to "a [specific] method for producing ingots of nickel base superalloys, including Alloy 718 (UNS N07718) and other nickel base superalloys experiencing significant segregation during casting."  U.S. Patent No. 6,416,564 col.1 ll.19–22 (filed Mar. 8, 2001).  The '858 Patent was issued on April 13, 2004, and is entitled "Large Diameter Ingots of Nickel Base Alloys."  (Am. Compl. ¶ 9.)

On November 14, 2003, ATI sent a letter to Carpenter.  (Id. ¶ 10.)  The letter stated, "It has come to our attention that [Carpenter] . . . may be considering either the manufacture, use, or sale of product using large diameter triple-melted 718 nickel alloy ingots greater than 30 inches in diameter, including up to 36 inches in diameter.  You should be aware that [ATI] owns U.S. Patent 6,416,564 and related pending patent applications covering the manufacture, use, and sale

of such large diameter nickel-base alloy ingots."[3]  (Compl. Ex. C. (letter from Patrick Viccaro,

Assistant General Counsel, ATI, to David Christiansen, General Counsel, Carpenter).)  ATI also

sent a copy of the '564 Patent.  (Id.)

On March 9, 2005, ATI sent another letter to Carpenter.[4]  (Am. Compl. ¶ 11.)  The letter

_____

[3] The November 14, 2003 letter reads:
Dear Mr. Christiansen:

It has come to our attention that companies involved in the manufacture of ingots, forgings, or gas turbines may be considering either the manufacture, use, or sale of product using large diameter triple-melted 718 nickel alloy ingots greater than 30 inches in diameter, including up to 36 inches in diameter.

You should be aware that Allegheny Technologies Incorporated owns U.S. Patent 6,416,564 and related pending patent applications covering the manufacture, use, and sale of such large diameter nickel-base alloy ingots.  ATI Allvac developed the patented invention, and the patents are assigned to ATI Properties, Inc., both are Allegheny Technologies companies.

Enclosed is a copy of U.S. Patent 6,416,564 for your ready reference.

Allegheny Technologies is proud of its technical achievements and values its intellectual property rights.  Our policy is to respect the valid patent rights of others, as we expect others to respect our patent rights.

If you have any questions regarding these patent rights, please let us know.

Very truly yours,
Patrick J. Viccaro
(Compl. Ex. C.)

[4] The March 9, 2005 letter reads:
Dear Mr. Christiansen:

In Mr. P. J. Viccaro's letter to you of November 14, 2003 (copy enclosed), we made you aware that Allegheny Technologies Incorporated owns and controls U.S. Patent 6,416,564 and related pending patent applications covering the manufacture, use, and sale of large diameter nickel-base alloy ingots.  One of the pending applications has since issued into U.S. Patent 6,719,858.  Enclosed is a copy for your ready reference. We also have foreign patent applications pending.

It has come to our attention that Cartech may be manufacturing and selling large diameter triple-melted 718 nickel alloy ingots greater than 30 inches in diameter,

reaffirmed ATI's ownership of the '564 Patent for the manufacture, use, and sale of large diameter nickel-base alloy ingots.  It stated that a pending application had since been issued into U.S. Patent 6,719,858.  (Id. Ex. D (letter from Jon Walton, General Counsel, ATI, to David Christiansen, General Counsel, Carpenter).)  Copies of both patents were sent as well.  Carpenter was asked to review the patents and clarify how Carpenter's process differed from ATI's patented process.  (Id.)

Following receipt of this second letter, Carpenter and ATI engaged in oral and written communications to discuss whether Carpenter's processes infringed upon ATI's patent rights and whether a licensing agreement might be possible.  (Id. ¶¶ 12, 89.)  The complaint further alleges that ATI sent similar letters to Carpenter's current and potential customers.  (Id. ¶ 13.)

On June 23, 2008, Carpenter filed its initial complaint against ATI seeking to have the '564 and '858 Patents declared invalid, unenforceable, and not infringed by Carpenter's processes so that it may make, use, and sell large diameter 718 Alloy ingots.  With ATI's consent, Carpenter filed an amended complaint (Document #30) on March 3, 2009, which included the claims in question.

The antitrust claim alleges a violation of Section 2 of the Sherman Act.  The complaint

---

including up to 36 inches in diameter.  We ask that Cartech review the subject patents and let me know in what ways the Cartech process differs from our patented process.  While we received no reply to the November 14, 2003 letter, we anticipate a prompt reply to this request.

Allegheny Technologies is proud of its technical achievements and values its intellectual property rights.  Our policy is to respect the valid patent rights of others, as we expect others to respect our patent rights.

Very truly yours,
Jon D. Walton

(Am. Compl. Ex. D.)

contends ATI is "monopolizing, attempting to monopolize and conspiring to monopolize the market for nickel base superalloy ingots in sizes greater than 30 inches in diameter through exclusionary conduct—namely, through the enforcement of the '564 and '858 Patents that were obtained by fraud or fraudulent means."  (Id. ¶ 65.)  Using its market power, ATI is allegedly requiring its competitors to challenge its patents and is interfering with existing and potential business relationships.  (Id. ¶ 69.)

The Lanham Act claim alleges ATI's communications with Carpenter's customers included "intentionally false and deliberately misleading representations" so as to "protect its production of Alloy 718 and Alloy 706 ingots" and "to disparage Carpenter and Carpenter's products."  (Id. ¶ 97.)

On March 19, 2009, ATI filed the pending motion to dismiss these claims.


## II. Standard of review

A motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure for failure to state a claim upon which relief can be granted examines the legal sufficiency of the complaint.  Conley v. Gibson, 355 U.S. 41, 45-46 (1957).  The factual allegations must be sufficient to make the claim for relief more than just speculative.   Bell Atlantic Corp. v. Twombly, 550 US 544, 127 S.Ct. 1955, 1965 (2007).  In determining whether to grant a motion to dismiss, a federal court must construe the complaint liberally, accept all factual allegations in the complaint as true, and draw all reasonable inferences in favor of the plaintiff.  Id.  See also D.P. Enters. v. Bucks County Cmty. Coll., 725 F.2d 943, 944 (3d Cir. 1984).

The Federal Rules of Civil Procedure do not require a plaintiff to plead in detail all of the

facts upon which he bases his claim.  <u>Conley</u>, 355 U.S. at 47.  Rather, the Rules require a "short

and plain statement" of the claim that will give the defendant fair notice of the plaintiff's claim

and the grounds upon which it rests.  <u>Id.</u>  The "complaint must allege facts suggestive of [the

proscribed] conduct."  <u>Twombly</u>, 127 S.Ct. at 1969.  Neither "bald assertions" nor "vague and

conclusory allegations" are accepted as true.  <u>See</u> <u>Morse v. Lower Merion School Dist.</u>, 132 F.3d

902, 906 (3d Cir. 1997); <u>Sterling v. Southeastern Pennsylvania Transp. Auth.</u>, 897 F. Supp. 893

(E.D. Pa. 1995).  The claim must contain enough factual matters to suggest the required elements

of the claim or to "raise a reasonable expectation that discovery will reveal evidence of" those

elements.  <u>Phillips v. County of Allegheny</u>, 515 F.3d 224, 234 (3d Cir. 2008) (quoting <u>Twombly</u>,

127 S.Ct. at 1965)).

## III. Discussion

### A. Count VII—Sherman Act

Section 2 of the Sherman Act imposes liability on "[e]very person who . . .

monopolize[s], or attempt[s] to monopolize, or combine[s] or conspire[s] with any other person

or persons, to monopolize any part of the trade or commerce among the several States."  15

U.S.C. § 2 (2006).  The complaint states ATI has monopolized, has attempted to monopolize,

and/or has conspired with its subsidiary to monopolize the relevant product market by enforcing

the '564 and '858 Patents.  (Am. Compl. ¶ 65).

The patents were allegedly obtained through fraudulent representations to the U.S. Patent

and Trademark Office (PTO).  In <u>Walker Process Equipment, Inc. v. Food Machinery &</u>

<u>Chemical Corp.</u>, 382 U.S. 172 (1965), the Supreme Court held that enforcing a patent obtained

by fraud upon the PTO may be the basis for an action under Section 2, provided the other elements of a Sherman Act claim are present.  Id. at 177.  To prevail, Carpenter must show that ATI (1) obtained the patents by fraudulent means, (2) possesses monopoly or monopolistic power in the relevant market, and (3) has used the patents to acquire or maintain that power as opposed to the growth or development attributable to a superior product, business acumen, or historic accident.  Id. at 177–78; Queen City Pizza v. Domino's Pizza, Inc., 124 F.3d 430, 437 (3d Cir. 1997).

### 1. Requirement of pleading the relevant market

ATI's primary argument for dismissal is that Carpenter failed to plead facts supporting its definition of the relevant market.  (See Defs.' Mem. to Dismiss at 15–17.)  I agree and will dismiss the claim without prejudice.

For a Walker Process claim, the court should "appraise the exclusionary power of the illegal patent claim in terms of the relevant market for the product involved.  Without a definition of that market there is no way to measure [the defendant's] ability to lessen or destroy competition."  382 U.S. at 177.  The plaintiff bears the burden of defining the relevant market. Queen City Pizza, 124 F.3d at 436.

To determine the strength of the plaintiff's claim, "[the] court must inquire into the relevant product and geographic market and the defendant's economic power in that market."  Id. at 442.  The outer boundaries of the relevant product market are defined by those commodities "reasonably interchangeable by consumers for the same purposes."  United States v. E.I. du Pont de Nemours & Co., 351 U.S. 377, 395 (1956).  In addition to the functional equivalence of the products, the price, use, and qualities of the items should be taken into account.  Queen City

Pizza, 124 F.3d at 437 (quoting Allen-Myland, Inc. v. Int'l Business Machines Corp., 33 F.3d

194, 206 (3d Cir. 1994), and citing Tunis Brothers Co., Inc. v. Ford Motor Co., 952 F.2d 715,

722 (3d Cir. 1991)).

 One way of measuring reasonable interchangeability is by using the cross-elasticity of

demand. Brown Shoe Co., Inc. v. United States, 370 U.S. 294, 325 (1962). "Cross-elasticity of

demand . . . measures the responsiveness of the demand for one product to changes in the price of

a different product." Queen City Pizza, 124 F.3d at 438 n.6 (quoting E. THOMAS SULLIVAN &

JEFFREY L. HARRISON, UNDERSTANDING ANTITRUST AND ITS ECONOMIC IMPLICATIONS 217

(1994)). To illustrate, "[i]f a slight decrease in the price of cellophane causes a considerable

number of customers of other flexible wrappings to switch to cellophane, it would be an

indication that a high cross-elasticity of demand exists between them; that the products compete

in the same market." du Pont, 351 U.S. at 400.

 Here, Carpenter borrows the patents' language to initially claim the relevant market as

"superalloy ingots of diameters larger than 30 inches." (Pl.'s Opp'n Mem. at 12; see also '564

Patent col.1 ll.19–21.) Though this definition may seem unnecessarily specific, later language in

the patent explains the reason for this specificity: "In certain critical applications, components

*must be manufactured from nickel base superalloys in the form of large diameter ingots* that lack

significant segregation." See, e.g., '564 Patent col.1 ll.39–41 (emphasis added). In this larger

form, the ingots may be used to manufacture rotating parts for power generation, aeronautical

and land-based turbines, and "other applications in which segregation-related metallurgical

defects may result in catastrophic failure of the component." See id. col.1 ll.32–34, 64–67.

Accepting these assertions as true, no other reasonably interchangeable commodities exist.[5] Large diameter nickel base superalloy ingots are the *only* acceptable products.

Any lingering questions regarding interchangeability are addressed by patent language stating that "ingots of the size contemplated by this invention have been successfully produced in several nickel base alloys (for example, Alloys 600, 625, 706, and Waspaloy) . . . ."  See, e.g., '564 Patent col.2 ll.45–48.  These additional alloys also fall in the superalloy category.  See id. col 2 ll.27–30 ("[I]ngots of Alloy 718, Alloy 706, and other nickel base superalloys such as Alloy 600, Alloy 625, Alloy 720, and Waspaloy are increasingly required in larger weights, and correspondingly larger diameters, for emerging applications.").  Thus, Carpenter's claimed relevant market covers and includes not just Alloy 718 but these other nickel base superalloys as well.

Carpenter's relevant market definition falls short, however, when considering whether non-infringing methods of producing large diameter ingots of nickel base superalloys exist.  That large diameter ingots have been made with Alloys 600, 625, 706, and Waspaloy suggests the existence of other non-infringing processes.[6]  Accepting as true Carpenter's assertion that ATI's

---

[5] In Queen City Pizza, the Third Circuit considered the antitrust violations alleged by Domino's Pizza franchisees against the parent corporation.  The plaintiffs described the relevant product market as the "ingredient, supplies, materials, and distribution services used by and in the operation of Domino's pizza stores."  124 F.3d at 437.  The Third Circuit rejected this definition for failure to include all reasonably interchangeable products.  Id. at 438.  The court stated the analysis was not limited "to the contractual restraints assumed by a particular plaintiff . . . but to the uses to which the product is put by consumers in general."  Id.  Applied to those facts, the Third Circuit believed the focus had to be on pizza makers as a whole and the functional interchangeability between Domino's and non-Domino's products.  Id.  Unlike the facts in Queen City Pizza, the complaint (through the patents) states that no other reasonable products exist for these applications.

[6] Carpenter argues that ATI has "impl[ied] that no non-infringing method of product [sic] exists" (id.), but even when drawing all reasonable inferences in Carpenter's favor, I do not read any such innuendo from ATI's motion to dismiss or its letters to Carpenter.  They state only that ATI holds a

patents cover "a process and a method (as opposed to a product)" (Pl.'s Opp'n Mem. at 12), the fact that other processes or methods of manufacturing the same types of products exist would undermine the claim. ATI would not have the alleged power to control the relevant market because the products in question could be produced by other methods.

Rather than speculate, I will dismiss the claim without prejudice for failure to state a claim upon which relief can be granted. The apparent failure to discuss the availability of other processes when challenging the monopolistic power of the holder of a process patent leaves Carpenter's claim fundamentally flawed. As Carpenter has requested leave to amend its complaint, I will grant Carpenter fourteen days to amend its definition of the relevant market, if it believes it can do so in good faith.

## 2. Conspiracy to monopolize claim

ATI also argues that Carpenter failed to sufficiently allege a conspiracy to monopolize under Section 2. To state a conspiracy claim under Section 2, Carpenter must present sufficient facts suggesting the existence of (1) a market or markets in which competition may be harmed; (2) an agreement between ATI and another entity; (3) ATI and its co-conspirator's specific intent to maintain ATI's monopoly power in the relevant market; (4) at least one overt act in furtherance of the conspiracy; and (5) a causal nexus between Carpenter's injuries and the alleged conspiracy. See Babyage.com, Inc. v. Toys "R" Us, Inc., 558 F. Supp. 2d 575, 586–87

---

patent "cover[ing] the manufacture, use, and sale of [large diameter triple-melted 718 nickel alloy ingots greater than 30 inches in diameter, including up to 36 inches in diameter." While this certainly would raise questions regarding Alloy 718 itself, my reading does not find the implication or insinuation that no other process of production exists.

I also note the complaint fails to state or suggest any facts relating to the existence (or non-existence) of non-infringing methods of production. With no allegations from Carpenter on the matter, the court is simply left to guess whether other methods exist.

(E.D. Pa. 2008).  The failure to plead a relevant market is fatal to this claim as well, but because additional grounds for dismissal are present, I will grant the motion as to this part.

In Copperweld Corp. v. Independence Tube Corp., 467 U.S. 752 (1984), the Supreme Court held that, for the purposes of Section 1 of the Sherman Act, a parent and its wholly owned subsidiary are incapable of conspiring with each other.  Id. at 777.  Upon reasoning that Section 1 is directed to proscribing concerted anti-competitive conduct, the Court found that "Section 1 is not violated by the internally coordinated conduct of a corporation and one of its unincorporated divisions."  Id. at 770.  Because the division of a corporate enterprise "reflects no more than a firm's decision to adopt an organizational division of labor," the coordinated activity of those corporate divisions "does not represent a sudden joining of two independent sources of economic power previously pursuing separate interests . . . ."  Id. at 770–71.  Finding this analysis to be equally applicable to the parent-subsidiary situation, the Court ruled that a parent and its wholly-owned subsidiary must be considered a single enterprise with common interests, objectives, and general corporate management.  Id. at 771.

This analysis is equally applicable to Section 2 conspiracy to monopolize claims.  See 1 ABA Section of Antitrust Law, Antitrust Law Developments 319 (6th ed. 2007) (citing numerous cases from the Fourth, Fifth, Seventh, Tenth and Eleventh Circuits stating that the Copperweld doctrine is equally applicable in Section 2 cases); see also Allen v. Washington Hosp., 34 F. Supp. 2d 958, 963 (W.D. Pa. 1999) (finding that officers and owners of the same corporation could not conspire to monopolize under Section 2).  Carpenter has conceded this point of law and stated it will not pursue this claim if there is evidence that ATI Properties was an ATI subsidiary.  (Pl.'s Opp'n Mem. at 15.)

ATI has presented an excerpt of a report it filed with the Securities and Exchange Commission (SEC), which states that ATI Properties is a wholly owned subsidiary.  (See Defs.' Reply Ex. 1.)  As the court may take judicial notice of such SEC filings when deciding a motion to dismiss, I will grant the motion as to this part and dismiss the claim to the extent it alleges a conspiracy to monopolize.  See Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 127 S. Ct. 2499, 2509 (2007) ("[C]ourts must consider the complaint in its entirety . . . [as well as] documents incorporated into the complaint by reference, and matters of which a court may take judicial notice."); Oran v. Stafford, 226 F.3d 275, 289 (3d Cir. 2000) (concluding that courts may take judicial notice of authenticated public disclosure documents filed with the Securities and Exchange Commission).

### 3. Dangerous probability of achieving monopoly power

The elements of an attempted monopolization claim are "(1) that the defendant has engaged in predatory or anticompetitive conduct with (2) a specific intent to monopolize and (3) a dangerous probability of achieving monopoly power."  Spectrum Sports v. McQuillan, 506 U.S. 447, 456 (1993).  ATI argues the complaint fails to set forth this third element.

The question of whether a defendant had a dangerous probability of successfully monopolizing is a fact-intensive inquiry.  Broadcom Corp. v. Qualcomm Inc., 501 F.3d 297, 319 (3d Cir. 2007).  Courts are to consider factors such as the defendant's market share, the strength of the competition, likely developments in the industry, entry barriers, the nature of the defendant's anti-competitive conduct, and the elasticity of demand.  See, e.g., Pastore v. Bell Tel. Co., 24 F.3d 508, 513 (3d Cir. 1994); Barr Laboratories, Inc. v. Abbott Laboratories, 978 F.2d 98, 112 (3d Cir. 1992). Because of the factual considerations involved, this element is typically

not resolved at the pleading stage "unless it is clear on the face of the complaint that the 'dangerous probability' standard cannot be met as a matter of law . . . ." Brader v. Allegheny Gen'l Hosp., 64 F.3d 869, 877 (3d Cir. 1995).  Where no meaningful allegations regarding market power, market share, or the ability to affect competition are presented, dismissal is appropriate.  See J.L. Terrel's v. Sherwin Williams Auto. Finishes Corp., 2004 WL 870705, at *4 (E.D. Pa. Mar. 30, 2004).

The factual allegations contained within the complaint are scant.  ATI is alleged to be one of only a few companies manufacturing nickel base superalloy ingots in sizes greater than 30 inches in diameter.  (Am. Compl. ¶¶ 66, 68.)  By enforcing the "fraudulently obtained" patents, ATI was allegedly in a position to foreclose competition in the relevant market.  (Id. ¶¶ 69–70, 73.)  Accepting these statements as true, I find that the complaint alleges sufficient facts to survive a motion to dismiss.  Indeed, it is not possible at this early stage to declare there is no reasonable expectation that discovery may yield evidence supporting this element.

**B. Count VIII—Lanham Act**

Section 43(a) of the Lanham Act provides a cause of action for any false or misleading descriptions or representations of a product.[7]  15 U.S.C. § 1125(a); United States Healthcare v.

---

[7] Section 43(a) provides:  Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which –

  (1)     is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person, or

  (2)     in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities, shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

Blue Cross of Greater Phila., 898 F.2d 914, 921 (3d Cir. 1990).  To prove a § 43 violation, a plaintiff must establish five elements: 1) the defendant has made false or misleading statements as to his own or another's product in commercial advertising or promotion; 2) there is actual deception or at least a tendency to deceive a substantial portion of the intended audience; 3) the deception is material in that it is likely to influence purchasing decisions; 4) the advertised goods traveled in interstate commerce; and 5) there is a likelihood of injury to the plaintiff in terms of declining sales, loss of good will, and the like.  Warner-Lambert Co. v. BreathAsure, Inc., 204 F.3d 87, 91-92 (3d Cir. 2000) (quoting Johnson & Johnson-Merck Consumer Pharmaceuticals Co. v. Rhone-Poulenc Rorer Pharmaceuticals, Inc., 19 F.3d 125, 129 (3d Cir. 1994)).  ATI moves to dismiss on the grounds that the complaint lacks allegations supporting the first and second elements of the *prima facie* case.  (Defs.' Mem. to Dismiss at 20–22.)

### 1. Commercial advertising or promotion

The first issue is whether the letters ATI sent to Carpenter and its customers, or potential customers, constitute "commercial advertising or promotion."  (See id. at 21 (stating Section 43 is limited to false descriptions and representations in advertising only).)  The phrase is not defined in the statute, but numerous courts in this district have defined it as "(1) commercial speech[8] (2) made by a defendant who is in commercial competition with plaintiff (3) for the purpose of influencing consumers to buy defendant's goods or services, and (4) that is sufficiently disseminated to the relevant purchasing public to constitute advertising or promotion

---

[8] Adopting the Supreme Court's reasoning in commercial speech cases, the Third Circuit identified three factors to consider whether speech is commercial: "(1) is the speech an advertisement; (2) does the speech refer to a specific product or service; and (3) does the speaker have an economic motivation for the speech."  United States Healthcare, 898 F.2d at 933 (citing Bolger v. Youngs Drug Prods. Corp., 463 U.S. 60, 66–67 (1983)).

within the industry." <u>See</u>, <u>e.g.</u>, <u>Neyvas v. Morgan</u>, 309 F. Supp. 2d 673, 680 (E.D. Pa. 2004);

<u>Chovanes v. Thoroughbred Racing Ass'n</u>, 2001 WL 43780, at *8 (E.D. Pa. Jan. 18, 2001);

<u>Unisource Worldwide, Inc. v. Heller</u>, 1999 WL 374180, at *6 (E.D. Pa. June 9, 1999).

This is a close question, and I will deny the motion.  There is no doubt that ATI and

Carpenter are market competitors.  What is less clear is whether these alleged letters constituted

commercial speech disseminated broadly with the intent to persuade.  The complaint alleges that

ATI sent letters to Carpenter's actual and potential customers.  It is not known, however, how

many customers received letters and what percent of the market those recipients comprise.  These

letters raised significant questions as to the legality of Carpenter's products; they may have also

implicitly suggested that ATI was a legal supplier of the same types of products.  Moreover, ATI

allegedly sent the letters in order to discourage Carpenter's business and to improve its own.

Based on these statements, it may be inferred that ATI sent the letters to some meaningful

proportion of the relevant purchasing public and was motivated by interests beyond protecting its

patents and business.  Discovery may provide facts confirming or disproving these inferences,

but accepting the complaint as true and drawing inferences in Carpenter's favor, the complaint

presents sufficient allegations for this claim to survive dismissal.[9]

### 2. Likelihood of deception or actual deception

---

[9] The primary case ATI has cited is <u>ISI International, Inc. v. Borden Ladner Gervais LLP</u>, 316 F.3d 731 (7th Cir. 2003).  In this case, the Seventh Circuit stated that letters to customers do not come within the scope of the Lanham Act.  <u>Id.</u> at 733.  I decline to adopt this reasoning as the interpretation is only persuasive authority, not controlling.  While the Seventh Circuit has established this rule of law, no other circuits appear to have taken adopted a similar line of reasoning to create a *per se* rule as to when letters to consumers can be the basis of a Lanham Act claim.  Given the current procedural posture and applicable standard of review, I will allow the claim to proceed to discovery so that more facts regarding ATI's intent and the scope of distribution can be ascertained.

As to the second element of the claim, ATI argues the complaint failed to state facts suggesting that its letters actually deceived the recipients or were likely to deceive a substantial segment.  (Defs.' Mem. to Dismiss at 21.)  I will dismiss this argument.  Section 43 liability for false or misleading advertising arises only "if the commercial message or statement is either (1) literally false or (2) literally true or ambiguous, but has the tendency to deceive consumers." Novartis Consumer Health, Inc. v. Johnson & Johnson-Merck Consumer Pharms. Co., 290 F.3d 578, 586 (3d Cir. 2002).  If the defendant's statements are literally false, then the plaintiff need not demonstrate that consumers were actually misled.  Rhone-Poulenc, 19 F.3d at 129.  To determine literal falsity, the court must determine "first, the unambiguous claims made by the advertisement . . . and second, whether those claims are false."  Novartis, 290 F.3d at 586 (citing Clorox Co. v. Proctor & Gamble Commercial Co., 228 F.3d 24, 34 (1st Cir. 2000)).  "[O]nly an *unambiguous* message can be literally false."  Id.

The motion will be denied as to this part.  The complaint states ATI knew its patent rights were invalid because they were knowingly obtained through fraud.  (Am. Compl. ¶ 98.)  It also states the letters' misrepresentations were material and "deceived or . . . likely . . . deceive[d]" the recipients.  (Id. ¶ 99.)  By proceeding to enforce these allegedly fraudulent patents, ATI necessarily made literally false communications regarding the viability and scope of its patents.  Though not a model of particularity, these allegations are sufficient to raise a reasonable expectation that discovery will reveal evidence of these elements.

**IV. Conclusion**

      For the foregoing reasons, I will grant the motion to dismiss in part and deny it in part.

Carpenter will be given fourteen days to amend Count VII of its amended complaint.